**NATIONAL FEDERATION OF FEDER-AL EMPLOYEES and Roessler Construction Co., Inc., Plaintiffs,**

v.

**UNITED STATES of America, and Richard Cheney, Secretary of Defense, Defendants.**

Civ. A. No. 89–1046.

United States District Court, D. Columbia.

Dec. 18, 1989.

H. Stephan Gordon, Gen. Counsel, Alice L. Bodley, Deputy Gen. Counsel, Anne L. Morgan, Jeffrey Sumberg, Staff Attys., National Federation of Federal Employees, Washington, D.C., for plaintiffs.

David J. Anderson, Jeffrey S. Gutman, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on defendants' Motion to Dismiss.[1] Plaintiffs in this case seek a declaratory judgment that the 1988 Base Closure and Realignment Act, enacted by Congress on October 24, 1988, is unconstitutional. After having reviewed the briefs submitted by the parties and after hearing oral argument from counsel, this Court is prepared to rule on defendants' motion.

## I. *BACKGROUND*

On May 3, 1988, then-Secretary of Defense Frank Carlucci chartered the Commission on Base Realignment and Closure, pursuant to the Federal Advisory Committee Act, 5 U.S.C. Appendix II. The Commission's stipulated responsibility was to "study the issues surrounding military base realignment and closure within the United States, it's commonwealths, territories, and possessions." Charter § 2, Report of Defense Secretaries Commission, App. A. The Commission was composed of twelve members each of whom were appointed or designated by the Secretary of Defense. Charter § 1.[2] The Charter expressly directed the Commission to consider at least nine specific criteria in making its recommendations: 1) current and future mission requirements and the impact on military operational readiness; 2) availability and condition of land and facilities at both existing and potential receiving locations; 3) potential to accommodate contingency, mobilization, and future force requirements at receiving locations; 4) cost and manpower implications; 5) extent and timing of potential cost savings; 6) economic impact on the base area community; 7) community support at the receiving locations; 8) environmental impact; and 9) the implementation process involved. Charter, § 2.

After undertaking this responsibility, the Commission recommended that 86 installations be fully closed, that five be partially closed, and that 54 other bases experience either an increase or decrease of activity because of relocation. It is projected that the implementation of these recommendations will result in annual savings of $693.6 million and total projected savings of $5.6 billion over the next twenty years.

On October 24, 1988, the United States Congress passed the Base Closure and Realignment Act, Pub.L. No. 100–526 (hereinafter, "Closure Act"). Sections 201(1) and (2) of the Act require the Secretary of Defense to close and realign all military installations recommended for closure by the Commission. These closures must be effectuated by the Secretary between Janu-

---

1. To the extent that this Court has relied on matters beyond the pleadings, defendants' Motion to Dismiss will be treated as a Rule 56 Motion for Summary Judgment pursuant to Fed.R.Civ.P. 12(b)(6).

2. Although the members of this Commission were directly appointed by the Secretary of Defense and not subject to confirmation by the United States Senate, all those who served on the Commission did execute affidavits in which they affirmed their allegiance to the United States and swore to defend the Constitution. *See* Def.Supp.Mem. Exhibit # 2.

ary 1, 1990 and September 30, 1991. § 201(3). Before any closures could be effectuated the Closure Act mandates that certain conditions would have to be satisfied: 1) no later than January 16, 1989, the Secretary must transmit to the House and Senate Armed Services Committees a report containing a statement that he has approved and the Department of Defense will implement all the closures recommended by the Commission (§ 202(a)(1)); 2) the Commission must transmit a copy of its report to the Senate and House Armed Services Committees with a statement that it identified the installations to be closed or realigned pursuant to § 203(b)(2) (§ 202(a)(2)); 3) the Secretary must transmit to the Commission a study of U.S. military installations outside the United States as specified in § 206(b)(1) (§ 202(a)(3)); 4) Congress must not pass a joint resolution of disapproval of the Commission's recommendations pursuant to § 208 within 45 days of March 1, 1989. § 202(b). The record before this Court demonstrates that each of these conditions has been satisfied.

Plaintiff National Federation of Federal Employees (NFFE) is an independent labor union which represents nearly 150,00 federal workers, and approximately 85,000 Department of Defense civilian workers. About 5000 of these workers are employed on military bases subject to closure or realignment pursuant to the Base Closure Act. NFFE and its affiliated locals serve as the exclusive bargaining representative for these federal workers pursuant to Title VII of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 5 U.S.C. § 7101 *et seq.*

Plaintiff Roessler Construction Co., Inc. (Roessler) is a private corporation doing business in Rantoul, Illinois. Over the past several years, Roessler has done extensive construction work for Chanute Air Force Base in Rantoul. Chanute is one of the bases that is scheduled for closure under the Closure Act. Roessler asserts that approximately 80% of its business during the past few years has been derived from Chanute contracts.

Plaintiffs seek a declaratory judgment that the Closure Act is unconstitutional. Count I alleges that the Closure Act violates the Constitution because it improperly delegates legislative authority to the Secretary of Defense and the Commission by allowing them to regulate the disposition of government property. It is plaintiffs' position that Article 4, Section 3, Clause 2 of the Constitution requires that Congress retain the power to dispose of any property belonging to the United States. Count II also raises an improper delegation claim. Plaintiffs assert that Article 1, Section 8 of the Constitution mandates that Congress retain the power to provide for the common defense of the United States. Count III challenges the provision in the Closure Act that allows Congress through the passage of a Joint Resolution to reject the recommendation of the Secretary and the Commission. Count IV seeks to have this Court review the findings of the Commission and the Secretary and declare them to have been "arbitrary, capricious, and contrary to law" under the Administrative Procedure Act, 5 U.S.C. § 706.

The remedy sought by plaintiffs is a permanent injunction which would prohibit the Secretary of Defense from closing or realigning any of the 86 bases that are scheduled to be closed or realigned pursuant to the Closure Act.

## II. DISCUSSION

### A. Standing

Initially, this Court must address the defendants' challenge to the plaintiffs ability to maintain this suit. It is defendants' position that the plaintiffs lack standing to challenge the Closure Act. If defendants are correct, this Court need not address the merits of plaintiffs' claims.

Standing is a complicated and ambiguous legal concept. As the Supreme Court has noted, "Generalizations about standing to sue are largely worthless as such." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (hereinafter, *ADAPSO* ). However, it is clear that in the federal courts the question

of standing takes on constitutional dimensions. Article III of the Constitution expressly limits the "judicial power" of the United States to the resolution of "cases" or "controversies." "The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982).

The central issue regarding standing is whether a particular litigant is entitled to have the court decide the merits of a dispute. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). To establish standing, a litigant must satisfy the constitutional requirements of Article III and the prudential considerations that have been developed by the Courts. *Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 757.[3] The aim of these constitutional requirements is to ensure that a litigant has an interest in the case to be adjudicated. The Supreme Court has broadly defined the constitutional requirements that a litigant must satisfy:

> Art. III requires the party who invokes the court's authority to show [1] that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury [2] fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision.

*Id.* at 472, 102 S.Ct. at 758 (citations and internal quotations omitted).

The courts have also fashioned a set of prudential principles that a litigant must satisfy in order to establish standing. The one principle of relevance to this case is that the "plaintiff's complaint [must] fall within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* at 474–75, 102 S.Ct. at 759–60 (quoting *ADAPSO*, 397 U.S. at 153, 90 S.Ct. at 830).

Defendants contend that plaintiffs lack standing to raise both the constitutional and APA claims that they advance. It is plaintiffs position that they meet all the requisite standing tests.

### 1). Constitutional Claims

Against this background, it is clear to this Court that the plaintiffs have satisfied the prerequisites for Article III standing. First, the NFFE members and Roessler have demonstrated that they will suffer "an injury in fact" if the Closure Act is allowed to be carried out. The NFFE members would suffer a direct harm if the bases where they are employed were closed pursuant to Closure Act. Similarly, Roessler is a corporation whose business prospects would suffer a direct injury if the Chanute Base was closed. An economic injury is sufficient to satisfy the first prong of the Court's tripartite test for constitutional standing. Second, the plaintiffs' injury must be causally linked to the action being challenged. As the Supreme Court has declared, "a federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976). Here, the injury alleged by plaintiffs is directly caused by the Closure Act. In the absence of the Closure Act, plaintiffs would not be adversely affected. Third, the plaintiffs have satisfied the redressability prong of the Supreme Court's standing test. In the event that this Court were to find the Closure Act to be unconstitutional, the very threat that plaintiffs now face would be removed. The fact that some alternative closure procedures could be implemented does not in and of itself defeat the standing of those challenging the Closure Act.

■ It is defendants' position that plaintiffs lack standing to maintain their separation of powers and delegation doctrine

---

**3.** Prudential standing and its impact upon plaintiffs' case is discussed in connection with plaintiffs' claim for judicial review under the Administrative Procedure Act.

claims. Under the standing principle enunciated by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), "party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights." *Id.* at 117, 96 S.Ct. at 681. Although defendants recognize this to be the controlling statement of law, they correctly argue that this principle only extends to those who are directly subject to the challenged governmental authority. Def.Supp.Mem., at 7, citing *Committee for Monetary Reform v. Board of Governors of the Fed. Reserve Sys.*, 766 F.2d 538 (D.C.Cir.1985). This Court agrees with defendants that plaintiff Roessler fails to meet this test. Roessler is in no sense directly subject to the authority of the Secretary of Defense. Rather, Roessler is merely a construction company that generates a significant percentage of its revenue through contracts with the Chanute base. Although Roessler will concededly suffer from the closing of the base, the company is, in this regard, not unlike thousands of other businesses in the communities that surround bases that are scheduled for closure. "[T]o allow all persons indirectly affected by an agency's decision to challenge its constitutional authority would open up the courts to ' "generalized grievance[s]" shared in substantial equal measure by all or a large class of citizens.' " *Committee for Monetary Reform*, 766 F.2d at 543 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).

■ As to plaintiff NFFE, this Court finds there is standing to assert a separation of powers claim. Unlike Roessler, NFFE represents the interests of individual civilian workers who are employed by the government to work at military installations. In *Committee for Monetary Reform*, the Court of Appeals for this Circuit held that a group of some 800 private businesses, associations, and individuals who sought to challenge the authority of the Federal Reserve System and the composition of the Federal Open Market Committee lacked standing to maintain a separation of powers claim. The primary basis for the court's determination was that the plaintiffs did "not allege that they [were] directly subject to the governmental authority they seek to challenge, but merely assert that they are substantially affected by the exercise of that authority." *Id.* at 543. In the instant case, plaintiff NFFE has alleged that its members are subject to the direct authority of the Secretary of Defense in that they are subject to Defense Department Regulations. Moreover, this Court cannot ignore the significant degree of authority and control that the Department of Defense has over these civilian employees. Accordingly, this Court finds that plaintiff NFFE has standing to raise its separation of powers claims.

### 2). Claims Under the Administrative Procedure Act

■ Turning to plaintiffs' claims for relief under the Administrative Procedure Act, it is necessary to evaluate whether plaintiffs have satisfied the "zone of interests" test enunciated by the Supreme Court in *ADAPSO*. This test requires that the interests that the plaintiffs seek to protect fall within the "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *ADAPSO*, 397 U.S. at 153, 90 S.Ct. at 830. Count IV of plaintiffs' complaint alleges that the Secretary's approval of the Commission's recommendations violated the APA. According to plaintiffs, the decision of the Secretary to approve the Commission's recommendations was arbitrary, capricious, and an abuse of discretion and should be set-aside by this Court. 5 U.S.C. § 706(2)(A).

The plaintiffs assert standing under § 702 of the APA. Section 702 provides standing to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. As the Court of Appeals for this Circuit has recently stated, "Section 702 and the prudential zone of interest test are intimately related—the

former provides a statutory grant from Congress to an aggrieved party to contest agency action and the latter provides a judicial limitation necessary to ensure that the proper party is asserting the claim against the agency." *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038 (D.C.Cir.1989) (hereinafter *NFFE* ). The "zone of interest" test, as the Supreme Court has noted, is "most usefully understood as a gloss on the meaning of § 702." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 758 n. 16, 93 L.Ed.2d 757 (1987).

The central issue, therefore, is whether the plaintiffs' are members of the class of persons who are arguably within the "zone of interests" established by the Closure Act.[4] As the *Clarke* Court declared:

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistently with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. at 757–58. (footnotes and citations omitted). Thus, it is necessary to review the Closure Act and its legislative history to determine whether plaintiffs' interests are consistent with and more than marginally related to the purposes of that Act. *NFFE v. Cheney*, 883 F.2d at 1042.

This Court finds that neither the NFFE nor Roessler fall within the zone of interests of the Closure Act. In passing this

Act, Congress was attempting to reduce the number of military bases and at the same time insulate itself from the political ramifications that would inevitably accompany a base closure decision. Members of Congress were acutely aware of the impact that such closures would have on the economy of communities that surround these bases and the significant job loss that would occur. Plaintiffs' interests are clearly inconsistent with the purposes of the Closure Act. Congress' fundamental objective was to save revenue and to create a more efficient base structure. Plaintiffs can point to nothing in the language of the Act or its legislative history that suggests that Congress contemplated the protection of federal employees or contractors. Absent some evidence that Congress intended for these plaintiffs to have a remedy, or that Congress desired to confer standing upon them, this Court must conclude that these plaintiffs fall outside of the Closure Act's "zone of interest." *See NFFE*, at 1047. As the Supreme Court has made clear, "The essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984)). Being unable to discern any such Congressional intent, these plaintiffs lack standing to pursue their APA claim.

### B. *NFFE's Substantive Claims*

#### 1). Nondelegation Doctrine Challenge

■ Counts I and II of plaintiff NFFE's Second Amended Complaint challenge the Closure Act's grant of authority to the Secretary of Defense and the Commission as an unlawful delegation of legislative power. Specifically, in Count I, plaintiff alleges that Congress improperly delegated its power under Article IV, Section 3,

---

4. In Count IV, plaintiffs also make reference to 10 U.S.C. § 151(b). That statutory section provides in relevant part that the Chairman of the Joint Chiefs of Staff is to be the principal military adviser to the President, the National Security Council, and the Secretary of Defense. This Court fails to see how this provision relates to plaintiffs' claims. Clearly, plaintiffs do not fall within the zone of interests protected by this statute.

Clause 2 to dispose of and regulate the use of United States property to the Executive Branch. In Count II, plaintiff alleges that Congress unlawfully delegated its power under Article I, Section 8, Clause 1 to provide for the common defense.

In making this argument, plaintiff NFFE runs in the face of a long line of adverse Supreme Court decisions. In fact, the Supreme Court has not seen fit to invalidate legislation on nondelegation grounds in over fifty years. *See Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989). The nondelegation doctrine has its foundation in the constitutional principle of separation of powers that underlies our tripartite system of government. Despite the strong emphasis that has been placed upon maintaining independence among the three branches, it has consistently been recognized that "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate branches." *Id.* 109 S.Ct. at 655. The test used to evaluate nondelegation issues was articulated by Chief Justice Taft:

> "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government coordination." So long as Congress "shall lay down an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

*Id.* at 654 (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 409, 48 S.Ct. 348, 351, 352, 72 L.Ed. 624 (1928)). Thus, in order to invalidate a delegation of Congressional power, the party challenging the legislative act must demonstrate that there is an "absence of standards" to guide executive action so that it would not be possible to ascertain whether the will of Congress has been obeyed. *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944). "Only the most extravagant delegations of authority, those providing no standards to constrain administrative discretion, have been condemned by the Supreme Court as unconstitutional." *Humphrey v. Baker,* 848 F.2d 211, 217 (D.C.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988).

Viewed in the light of this case precedent, this Court is of the opinion that the Closure Act is not a standardless delegation of authority to the Secretary of Defense. Instead, the statute adequately delineates the general policy that Congress sought to further and there are clear boundaries to this delegation. *American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). Section 201(1) of the Closure Act expressly requires the Secretary to close those military bases recommended for closure by the Commission "in the report transmitted to the Secretary pursuant to the Charter establishing such Commission." Congress, therefore, explicitly contemplated that the standards that were to guide the Commission were those contained in the Commission's Charter. That Charter established nine criteria that the members of the Commission were to consider when making there evaluations and recommendations. Although this Court is troubled by the fact that the Closure Act implicitly effectuates a "double delegation",[5] it cannot be said that such an arrangement is in and of itself unconstitutional. "[I]n our increasingly complex society replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta,* 109 S.Ct. at 654.

Accordingly, summary judgment will be entered in favor of defendants as to Counts I and II of plaintiff NFFE's complaint.

---

**5.** The Closure Act effectuates a "double delegation" in the sense that it not only delegates authority to the Secretary of Defense, it expressly requires that a Commission selected by the Secretary has the responsibility for presenting a complete base closure package which the Secretary must either accept or reject in full.

### 2). Separation of Powers

In Count III, plaintiff NFFE alleges that the Closure Act violates the separation of powers doctrine because it authorizes Congress to reject the Commission's recommendations through the passage of a joint resolution. *See* Closure Act, §§ 202(b) & 208. NFFE argues that this express retention of Congressional authority violates the separation of powers principle because it represents a direct attempt by Congress to retain direct control over delegated administrative power. Pl.Opp. at 23. Plaintiff's reasoning is specious and without merit.

Congressional retention of the power to reject the Commission's recommendations through the passage of a joint resolution in no way enhanced Congressional authority. Assuming the absence of such a provision, Congress could simply have passed a new law if it disagreed with the recommendations; Congress always has the authority to pass a new statute. Plaintiff's position is particularly weak given the fact that a joint resolution and a bill are for all intents and purposes constitutionally indistinguishable. Both require passage by both Houses of Congress and presentment to the President for action.[6] Article I, Section 7, Clause 3 requires that a resolution must have the concurrence of both Houses of Congress, "shall" be presented to the President, and either signed by the President or vetoed and be repassed by two-thirds of both Houses.

Accordingly, summary judgment will be entered in favor of defendants as to Count III of plaintiff NFFE's complaint.

### III. *CONCLUSION*

Although this Court is not prepared to endorse the steps that Congress took to insulate itself from the realities of political life, it is clear that the action taken is not Constitutionally infirm.

An appropriate Order accompanies this Opinion.

6. The one exception to this general rule is a Joint Resolution which proposes an amendment to the Constitution. Such a Resolution must be

### *ORDER*

Upon consideration of defendants' Motion to Dismiss, plaintiffs' opposition thereto, the oral argument of counsel, and in accordance with the opinion issued this date in the above captioned matter, it is this 15th day of December 1989 hereby

ORDERED that the claims of plaintiff Roessler be dismissed for lack of standing, and it is

FURTHER ORDERED that plaintiff National Federation of Federal Employees' (NFFE) Administrative Procedure Act claims be dismissed for lack of standing, and it is

FURTHER ORDERED that summary judgment be entered in favor of the defendants as to plaintiff NFFE's constitutional claims.

SO ORDERED.

approved by two-thirds of both Houses but presentment to the President is not required. U.S. Const. art. IV.