### NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Appellants,

v.

### UNITED STATES of America, et al., Appellees.

### No. 90–5004.

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1990.

Decided June 5, 1990.

Anne L. Morgan, with whom H. Stephan Gordon and Alice L. Bodley, Washington, D.C., were on the brief, for appellants.

Charles R. Schmadeke, Springfield, Ill., of the Bar of the Supreme Court of Illinois, pro hac vice, by special leave of the Court, for amicus curiae, urging that this Court declare the Base Closure and Realignment Act unconstitutional.

Scott R. McIntosh, Atty., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, Jay B. Stephens, U.S. Atty., U.S. Dept. of Justice, and Douglas N. Letter, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, and MIKVA and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

The National Federation of Federal Employees ("NFFE") and Roessler Construction Company ("Roessler") appeal a final judgment of the district court, 727 F.Supp. 17, dismissing a suit against the United States and the Secretary of Defense ("Secretary"). NFFE and Roessler brought suit to enjoin the Department of Defense from closing or realigning any of 145 domestic military bases pursuant to the Base Closure and Realignment Act, Public Law No. 100–526, 102 Stat. 2623 (1988) ("Base Closure Act" or "Act").[1] Plaintiffs challenged the constitutionality of the Base Closure Act under the non-delegation doctrine and separation of powers doctrines. In the alternative, plaintiffs sought Administrative Procedure Act ("APA") review of the decisions by the Secretary to close and realign bases under the Act.

The district court held that NFFE had standing to raise the constitutional claims but that Roessler did not. The court then granted summary judgment to the government on the merits of the constitutional claims. Finally, the court found that both plaintiffs lacked standing to pursue the APA claim.

We affirm the district court's finding that NFFE has standing to pursue its constitutional claims and consequently need not reach the question of Roessler's standing. *See, e.g., Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 2580 n. 15, 101 L.Ed.2d 520 (1988); *Hazardous Waste Treatment Council v. United States Environmental Protection Agency,* 861 F.2d 270, 273 (D.C.Cir.1988).[2] Further, we affirm the district court's decision dismissing NFFE's constitutional claims on the merits. Finally, we dismiss appellants' APA claims on the ground that the matter is committed to agency discretion as a matter of law. Thus, we do not reach the issue of APA standing.

## I. BACKGROUND

In May of 1988, then-Secretary of Defense Frank Carlucci chartered the Commission on Base Realignment and Closure ("Charter") to "study the issues surrounding military base realignment and closure within the United States ..." and to "[r]eview the current and planned military base structure in light of force structure and assumptions ... *and identify which bases should be closed or realigned.*" Charter §§ 2(A) & 2(B) (emphasis added). The Commission was composed of 12 members, each of whom were appointed or designated by the Secretary of Defense. Charter § 1. The Charter expressly directed the Commission to consider nine specific criteria in making its recommendations: (1) current operational readiness; (2) availability and condition of land and facilities at both existing and potential receiving locations; (3) force requirements at receiving locations; (4) cost and manpower implications; (5) extent and timing of potential cost savings; (6) economic impact on the base area community; (7) community support at the receiving locations; (8) environmental impact; and (9) the implementation process involved. Charter § 2.

---

**1.** NFFE is an independent labor union which represents the workers who are employed on the military bases that are subject to closure. Roessler is a private corporation that has done extensive construction for Chanute Air Force Base, one of the bases that is scheduled to be closed.

**2.** We note in passing that since NFFE meets Article III's standing requirements as traditionally formulated—allegations of actual or threat- ened harm fairly traceable to the challenged action which is likely to be redressed by a favorable decision—, it need not also meet an alternative formulation of the standing test discussed in *Committee for Monetary Reform v. Board of Governors of the Fed. Reserve Sys.,* 766 F.2d 538, 543 (D.C.Cir.1985), which requires a plaintiff to show that he is directly subject to the governmental authority he seeks to challenge.

The Commission eventually recommended that 86 installations be fully closed, that five be partially closed and that 54 others be relocated with an attendant increase or decrease of activity.

In October of 1988, Congress passed the Base Closure Act. Sections 201(1) and 201(2) of the Act required the Secretary of Defense to close and realign all military installations recommended for closure by the Commission "in the report transmitted to the Secretary pursuant to the Charter establishing such Commission." The Act required that these closures be made between January of 1990 and October of 1991. *See* § 201(3).

Before any closures could be made, however, certain conditions set out in the statute had to be met: (1) no later than January 16, 1989, the Secretary must transmit to the House and Senate Armed Services Committees a report containing a statement that he had approved and the Department of State would implement all the closures recommended by the Commission, § 202(a)(1); (2) the Commission had to transmit a copy of its report to the House and Senate Armed Services Committees with a statement that identified the installations to be closed or realigned pursuant to § 203(b)(2), § 202(a)(2); (3) the Secretary would carry out the closings and realignments only if Congress did not enact a joint resolution of disapproval within 45 days of March 1, 1989, § 202(b) ("report and wait" provision). Each of these conditions has been satisfied.

## II. Discussion

### A. *Standing to Raise the Constitutional Claims*

■ "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). In order to establish standing, a litigant must satisfy three constitutional requirements:

> Art. III requires the party who invokes the court's authority to show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury [2] fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision.

*Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).[3] We agree with the district court, as does the government, Appellee's Brief at 15, that NFFE has satisfied these three Article III standing requirements.[4]

First, there can be no doubt that NFFE's members satisfy the "actual injury" requirement; many of them will lose their jobs if the base closings are carried out. It is also indisputable that the injury NFFE's members will suffer is exclusively traceable to the potential base closings. If the base closures do not take place, NFFE's members will suffer no harm. Finally, it is clear that the harm NFFE's members will suffer as a result of the base closings will be redressed by a decision in favor of NFFE. A finding that the Base Closure Act is unconstitutional would eviscerate the threat that NFFE's members now face; the bases would remain open, at least for a while longer, and as a consequence their jobs would be spared.

---

**3.** In addition to these constitutional requirements, the Supreme Court has articulated prudential considerations that a federal court may invoke when making standing determinations. But as the Court said in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80–81, 98 S.Ct. 2620, 2634–2635, 57 L.Ed.2d 595 (1977), "[w]here a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented by the relief requested, the basic prac-

tical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met." Since we find that here NFFE meets the criteria described in *Duke Power,* we do not find it necessary to address any of the prudential concerns regarding standing.

**4.** As noted above, we therefore need not reach the question of Roessler's standing.

## B. *The Excessive Delegation Claim*

■ Appellants claim that the Base Closure Act's grant of authority to the Secretary of Defense and the Commission amounts to an excessive delegation of legislative discretion in violation of the constitutionally based non-delegation doctrine. We disagree.

The non-delegation doctrine has its roots in the separation of powers principle underlying our tripartite system of government. Thus the Supreme Court has explained that "the integrity and maintenance of the system of government ordained by the Constitution" preclude Congress from delegating its legislative power to either the Executive or Judicial Branches. *Field v. Clark,* 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892). The Court has also recognized, however, that the "separation of powers principle and the non-delegation doctrine in particular, do not prevent Congress from obtaining the assistance of the coordinate branches." *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989). The test the Court has employed to determine whether Congress has obtained too much assistance, *i.e.,* whether it has transgressed the non-delegation doctrine, is a well-settled one. As Chief Justice Taft explained:

"In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government coordination." *So long as Congress "shall lay down an intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

*Id.* 109 S.Ct. at 654 (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)) (emphasis added).

The "intelligible principle" test has not been a tough one. Indeed, as noted in *Mistretta,* 109 S.Ct. at 655, the Supreme Court has not invalidated legislation on non-delegation grounds in over fifty years.

*See also Humphrey v. Baker,* 848 F.2d 211, 217 (D.C.Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988) ("Only the most extravagant delegations of authority, *those providing no standards to constrain administrative discretion,* have been condemned by the Supreme Court as unconstitutional.") (emphasis added).

The Base Closure Act easily clears the "intelligible principle" hurdle; it contains a terse but understandable standard to constrain administrative discretion. As the district court found, § 201(1) of the Act expressly requires the Secretary to close those military bases recommended for closure by the Commission "in the report transmitted to the Secretary *pursuant to the Charter establishing such Commission*" (emphasis added). Congress therefore explicitly adopted as guidelines for the Secretary the same standards that govern the Commission in its Charter.

The Charter contains nine quite specific criteria, listed at pp. 402–403 *supra,* which informed the Commission's base closure decisions. These nine criteria provide more than adequate standards for making base closing and realignment decisions and keep the Base Closure Act well within the bounds of lawful delegation.

## C. *The Separation of Powers Claim*

■ Appellants argue that the Act violates the separation of powers principle in that it allows Congress to interfere impermissibly with both the Judiciary and the Secretary of Defense (the Executive Branch). This claim is worth little.

As to the Executive Branch, appellants contend that by maintaining a role in the Secretary's decisionmaking process after delegation through the Act's joint resolution mechanism, Congress is interfering excessively with his performance of the delegated duties. We disagree. The joint resolution mechanism does not enhance congressional power vis-a-vis the Executive Branch because like all other statutes, it is subject to the President's veto.

Appellants also argue that retaining the authority to veto the Commission's recom-

mendations again through the joint resolution vehicle, Congress has interfered with the power of the Judiciary, "for it is the exclusive role of the courts to assess the Executive's fidelity to congressional mandates." Appellants' Brief at 33. Thus appellants assert that if "Congress itself disapproves the [Secretary's decisions], Congress has usurped the role of the judiciary." Reply brief at 23. This argument kindles no spark because if appellants' APA claim were justiciable, we would review the Secretary's decisions notwithstanding Congress' prior "review." The bar to federal review of the Secretary's decisions does not lie in Congress' opportunity to review them before we do; it is the subject matter of the decisions the Secretary made that makes appellants' claim nonjusticiable.

Of course, if Congress passed and the President assented to the joint resolution rejecting the Secretary's decisions, judicial review would be foreclosed. But even absent the joint resolution mechanism, Congress could still achieve the same result by passing a law vetoing the Secretary's decisions. Surely passage of a law does not violate the separation of powers principle even though judicial review of the Secretary's decisions would thereby be foreclosed. For this reason, we have explained before that

> [A] legislative review mechanism permitting a rule to be repealed by a joint resolution presented to the President would present no constitutional problems. Even though such a device would still differ from enactment of a statute— since the statutory language would remain the same although the specific action was forbidden, and since a veto resolution is easier to adopt than an affirmative bill—the essential elements of the constitutional lawmaking process would participate. There would be neither an increase in total federal power nor a violation of separation of powers. Congress would be exercising power in a manner consistent with Article I.

*Consumer Energy Council of America v. FERC*, 673 F.2d 425, 470 (D.C.Cir.1982).

### D. The APA Claim

■ NFFE claims that the Secretary's base closing and realignment decisions were arbitrary and capricious and thus violative of the APA. We agree with the government that even if appellants had standing to challenge the Secretary's decisions, their claim is nonjusticiable because the Secretary's decisions were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[5]

In determining whether agency action has been committed to agency discretion by law, "we ask whether the applicable statutes and regulations are 'drawn so that a court would have [a] meaningful standard against which to judge the agency's exercise of discretion.' " *CC Distributors, Inc. v. United States*, 883 F.2d 146, 153 (D.C. Cir.1989) (emphasis added) (quoting *Heckler v. Cheney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). As the Supreme Court has explained, "if no *judicially manageable standards* are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.' " *Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655 (emphasis added). Here the problem is not that the Act is devoid of criteria; as noted above, the Act (through the Charter) sets forth nine specific criteria to be considered in making base closing decisions. Rather the rub is that the subject matter of those criteria is not "judicially manageable."

The Commission concluded that "the military value of a base should be the preeminent factor in making [the Commission's] decisions." Commission Report ("Report") at 6, Joint Appendix ("J.A.") at 36. *See also id.* at 11, J.A. at 41 ("military value" was "cornerstone" of Commission's analysis). Thus, the number of bases closed "depend[ed] largely upon the amount of excess capacity found in the system,"

---

**5.** The district court found that neither NFFE nor Roessler had APA standing because their claim did not fall within the "zone of interests" of the Base Closure Act. Because we find appellants' APA claim to be nonjusticiable, we do not address the question of APA standing.

which in turn depend[ed] on a "judgment about the fit between the requirements of the military forces that use the base structure and its capacity." *Id.* at 15, J.A. at 45. The military value of each individual installation was assessed by considering "how well it met the mission-related needs of the units or activities located there." *Id.* at 12, J.A. at 42. The Commission was assisted in this assessment by a professional staff, half of whose members were drawn from the Department of Defense. *Id.* at 10, J.A. at 40, 78; *see* § 203(c).

It is clear, then, that judicial review of the decisions of the Secretary and the Commission would necessarily involve second-guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure. We think the federal judiciary is ill-equipped to conduct reviews of the nation's military policy. Such decisions are better left to those more expert in issues of defense. Thus we find NFFE's APA claim nonjusticiable. *See Curran v. Laird*, 420 F.2d 122 (D.C.Cir.1969) (*en banc*).

### III. CONCLUSION

While appellants have standing to raise their excessive delegation and separation of powers claims, we agree with the district court that appellants lose on the merits of those claims: the Base Closure Act neither violates the non-delegation doctrine nor transgresses the separation of powers principle. Furthermore, appellants' claim that the Secretary's base closing decisions were violative of the APA is nonjusticiable because those decisions were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Accordingly, appellants' request for review of the district court's decision is denied.

*So ordered.*