**CHARLES E. SMITH MANAGEMENT, INC., and Plaza Associates, L.P., Plaintiffs,**

v.

**Les ASPIN, In his Official Capacity as Secretary of Defense and The Defense Base Closure and Realignment Commission, Defendants.**

No. Civ. A. No. 93–844–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 14, 1994.

Benjamin G. Chew, Washington, DC, for plaintiff.

Helen F. Fahey, U.S. Atty., E.D. of VA, Richard Parker, Asst. U.S. Atty., Alexandria, VA, for defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

This case came before the Court on plaintiffs' motion for summary judgment and defendants' motion to dismiss. Plaintiff Charles E. Smith Management, Inc., ("Smith") is a District of Columbia corporation with its principal place of business in Arlington, Virginia. Smith is the managing agent for various real estate limited partnerships that own buildings that are the subject of the motion at hand. Plaintiff Plaza Associates, L.P. is a limited partnership organized under the laws of Virginia, with its principle place of business in Arlington, Virginia. Plaza owns buildings known as Crystal City Plaza 5 and Crystal City Plaza 6, which it leased to the General Services Administration ("GSA") and which are occupied, in part, by the Navy Sea Systems Command and the Navy Supply Systems Command. Plaintiff

Smith serves as Plaza's managing agent for those leases. Defendant Les Aspin ("the Secretary") is named in his official capacity as the Secretary of Defense. Defendant Base Closure and Realignment Commission ("Commission") is an independent commission established under § 2902 of the 1990 Defense Base Closure and Realignment Act ("the Act") Pub.L. No. 101–510, §§ 2901–2910, 104 Stat. 1808 (1990), as amended by Pub.L. No. 102–190, § 2821, 105 Stat. 1290 (1991). The Commission's principle place of business is in Arlington, Virginia.

The Defense Base Closure and Realignment Act of 1990 is an attempt to legislate the process by which domestic military installations are closed and realigned. The Act provides a selection process for unneeded military installations to be closed or realigned.

The Act established an independent Defense Base Closure and Realignment Commission to meet in 1991, 1993, and 1995. It requires the Secretary of Defense to develop a six-year force structure plan, which assesses national security threats and the force structure needed to meet them. The Secretary is to provide the plan to the Commission. The Act also requires the Secretary to publish in the *Federal Register* for notice and comment the selection criteria he proposes to use to recommend installations for closure or realignment.

Under the timetable provided in the 1991 amendments to the Act, the Secretary is required to recommend installations for closure and realignment by March 15, based on the force structure plan and selection criteria. The Act directs the Secretary to summarize in the *Federal Register* the process by which each installation was recommended for closure or realignment and to provide a justification of each recommendation. The Act requires the Comptroller General, the head of the General Accounting Office (GAO), to analyze and report to Congress on the Secretary's recommendations and selection process by May 15.

Congress charged the Commission with reviewing the Secretary's recommendations, and with preparing a report for the President containing its assessment of the Secretary's proposals and its own closure and realignment recommendations. The Comptroller General, to the extent requested, is directed to assist the Commission in its review. The Act requires the Commission to hold public hearings on the Secretary's recommendations. The Commission may change any of the Secretary's recommendations if they deviate substantially from the force structure plan and final criteria. If the Commission proposes to change the Secretary's recommendations by adding military installations to the list for closure and realignment, it must publish the proposed changes in the *Federal Register* thirty days prior to submitting its recommendations to the President and hold public hearings on the proposed changes.

The Commission must report its recommendations to the president by July 1. The President must approve or disapprove the Commission's recommendations in whole or in part and transmit this determination to the Commission and Congress. If the President disapproves any recommendations, the Commission has until August 15 to submit a revised list of recommended closures and realignments to him. If the President does not approve the revised list of recommendations by September 1, the process for that year terminates.

If the President approves the Commission's recommendations, Congress has 45 days from the date of approval or until the adjournment of Congress sine die, whichever is earlier, to pass a joint resolution (which is subject to presentment to the President) disapproving the recommendations in toto. Congress may not pick and choose among the recommendations; it must approve or disapprove them in their entirety without amendment. If a joint resolution of disapproval is passed, the Secretary of Defense may not carry out the closures and realignments approved by the President.

If Congress does not, through a joint resolution, disapprove the recommendations, the Secretary is required to implement them. The Secretary must initiate all recommended closures and realignments no later than two years after the date on which the President

sent his report to Congress. All such closures and realignments must be completed within six years from the date of the President's report to Congress.

The Department of the Navy established a Base Structure Evaluation Committee (BSEC), responsible for closure and realignment recommendations for the 1993 round of base closing. The Navy also established a Base Structure Analysis Team (BSAT) to provide support to the Committee.

The BSEC began its analysis by categorizing installations according to the types of support they provided to Navy and Marine Corps operations forces. Additional information regarding excess capacity and military value was adduced through "data calls" on installations. Military value was determined based on an assessment of facilities, readiness, mobilization capability, and cost and manpower implications.

The BSEC used computer models to develop closure and realignment recommendations. Recommendations were based on military judgment as applied to the computer results. The Navy evaluated all potential candidates for closure or realignment against the final criteria. Its recommendations were submitted to the Chief of Naval Operations who, as the Acting Secretary of the Navy, nominated installations to the Secretary of Defense for closure or realignment.

The Secretary of Defense submitted his recommendations to the Base Closure Commission. Those recommendations included the realignment and relocation of the Naval Sea Systems Command, Naval Air Systems Command, Naval Supply Systems Command, Space and Naval Warfare Systems Command, Naval Facilities Engineering Command, Naval Recruiting Command, Navy Field Support Activity, International Programs Office, Naval Criminal Investigative Service, Navy Regional Contracting Center, Strategic Systems Programs Office, and the Bureau of Naval Personnel.

After receipt of the Secretary's recommendations, the Commission held investigative hearings, 17 regional hearings nationwide to hear from potentially affected communities, and conducted over 125 fact-finding visits to installations recommended for closure or realignment.

The Commission also held seven investigative hearings in Washington, D.C., questioning Defense Department representatives involved in preparing the Secretary's recommendations. After this review, the Commission recommended to the President that 130 installations be closed and 45 be realigned.

The Commission's recommendations included the realignment of the Naval Systems Commands from the Crystal City leased space to sites in Maryland, Pennsylvania, Tennessee, and the National Capital Region. The Commission noted that the realignment of the National Capital Regional activities would produce "substantial" cost savings.

On July 2, 1993, President Clinton approved the recommendations of the Commission. The period for congressional action has elapsed and Congress has not passed a proposed joint resolution of disapproval.

Plaintiffs assert that under the Federal Property and Administrative Services Act, 40 U.S.C. § 490, the General Services Administration has exclusive jurisdiction over the Crystal City leased property. Since this space is under the jurisdiction of GSA, the Naval Systems Commands are not a "military installation" within the meaning of the Base Closure Act, and the recommendation of the Commission, subsequently approved by the President, to move the Navy activities conducted in the GSA–leased space exceeds the jurisdiction and authority provided by the Base Closure Act. Plaintiffs request the Court to declare that the Crystal City office buildings are not military installations subject to the jurisdiction of the Base Closure Act, and enjoin the defendants from taking any action under the Base Closure Act to implement the Commission's recommendations with respect to the Crystal City office buildings. The defendants' move to dismiss, because the plaintiffs have failed to allege any injury, lack standing and have no right to review under the Administrative Procedure Act.

 Article III of the Constitution limits federal court jurisdiction to "actual cases or controversies." *Simon v. Eastern Ken-*

*tucky Welfare Rights Organization,* 426 U.S. 26, 37, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). This requirement dictates that a plaintiff demonstrate, as an "irreducible minimum," that it has suffered an injury in fact, that the injury "can fairly be traced to the challenged action" and that the injury "is likely to be redressed" by the relief sought. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted); *Simon,* 426 U.S. at 38, 41, 96 S.Ct. at 1924, 1925–26. A Plaintiff "must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements", *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990); "standing cannot be 'inferred argumentatively from averments in the pleadings....' " *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) (citations omitted).

■ Even where the plaintiff demonstrates an injury in fact, it must still establish that it is "within the 'zone of interests' sought to be protected" by the statute in question. *Air Courier Conf. of America v. American Postal Workers Union, AFL–CIO,* 498 U.S. 517, 523–4, 111 S.Ct. 913, 918, 112 L.Ed.2d 1125 (1991) (citations omitted); *Valley Forge Christian College,* 454 U.S. at 457, 102 S.Ct. at 748–49. Plaintiffs' claims against the Secretary of Defense and the Base Closure Commission fail to satisfy each of these constitutional requirements.

■ To meet the injury-in-fact requirement, a plaintiff must allege and establish more than a subjective, hypothetical or speculative injury. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The harm must be concrete, objective, immediate and direct. *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675; *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). If the plaintiff cannot demonstrate a "distinct and palpable injury," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975), "no other inquiry is relevant to consideration of standing," and the complaint should be dismissed. *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 227 n. 16, 94 S.Ct. 2925, 2935 n. 16, 41 L.Ed.2d 706 (1974).

■ The amended complaint makes no allegation that plaintiff has or will suffer an injury. Plaintiffs allege merely that, as a result of the relocations and realignments recommended by the Secretary and approved by the President, the office buildings owned and managed by plaintiffs in Arlington, Virginia, will no longer serve as the locations of the Naval Systems Commands.

This allegation is not sufficient to support plaintiffs' standing. Plaintiffs appear to be claiming they will be injured because the Naval Systems Commands will no longer be its tenant. However, the space is leased to GSA, not these defendants.

Plaintiffs can assert no harm if the Crystal City space is no longer used by the Naval Systems Commands. The Secretary has two years from the President's approval to initiate closures and realignments, and must complete them within six years. There is no allegation as to which lease terms for the Crystal City space now occupied by the Naval Systems Commands extends beyond six years. If the lease terms were longer than six years, there is no indication that GSA would terminate the leases, rather than elect to use the space for other government activities. And if GSA were to terminate prematurely its leases with the plaintiffs, the space is in a desirable location, making it well-suited to re-lease.

Even if plaintiffs were able to show that they will suffer an injury in fact sufficient to satisfy standing requirements, they must also demonstrate that it falls within a zone of interest protected by the Base Closure Act. *Air Courier Conference,* 498 U.S. at 523–24, 111 S.Ct. at 917–18 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990)). The essential inquiry posed by this requirement is one of congressional intent. Did Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law. *Clarke v. Securities Industry Association,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (quoting *Block v. Community Nutrition Inst.,* 467 U.S. 340, 347,

104 S.Ct. 2450, 2454–55, 81 L.Ed.2d 270 (1984)); *Air Courier Conference,* 498 U.S. at 524, 111 S.Ct. at 918. The purpose of the zone-of-interest test is to exclude plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives. *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12.

Plaintiffs are private real estate and real estate management companies and do not fall within any zone of interest of the Base Closure Act. The purpose of the Act is to facilitate the closure or realignment of military installations no longer needed in light of a reduced military. *See* H.R.Rep. 101–665, 101st Cong., 2d Sess. 341, *reprinted in* 1990 U.S.Code Cong. & Admin. News 2931, 3067 (H.R.Rep. 101–665). Congress acknowledged the need to close military installations despite the economic dislocations that might result. Congress recognized that closures might be derailed through litigation and, accordingly, expressed its belief that military determinations, such as the Secretary of Defense's realignment and closure recommendations, should not be and are not subject to judicial review. H.Conf, Rep. No. 101–923, 101st Cong., 2d Sess. 705, *reprinted in* 1990 U.S.Code Cong. & Admin.News 3110, 3257–58. (H.R.Conf.Rep. 101–923).

Plaintiffs' interest in blocking the realignment of the Naval Systems Commands, contrary to the recommendations of the Secretary and the Commission, and the decision of the President, is not in accord with the Act's purpose to establish a streamlined process to ensure the prompt closure and realignment of military installations. Nor is there anything in the Act or its legislative history that reflects a congressional intent to protect the economic interests plaintiffs may be asserting, or its interest in having the space it manages occupied by the Naval Systems Commands. *Compare National Fed'n of Federal Employees v. United States,* 727 F.Supp. 17, 22 (D.D.C.1989), *request for review denied,* 905 F.2d 400 (D.C.Cir.1990), *with People Ex Rel Hartigan v. Cheney,* 726 F.Supp. 219, 227 (C.D.Ill.1989).

Absent specific statutory authorization, only final agency action for which there is no other adequate remedy in a court is subject to judicial review under the Administrative Procedure Act. 5 U.S.C. § 704. As the Supreme Court has explained, the core question in determining whether agency action is final is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992).

In *Franklin,* the Court held that an APA challenge to the decennial reapportionment of the House of Representatives could not be entertained, because none of the actions at issue in the case constituted final agency action. Under the applicable census statutes, the Secretary of Commerce submitted a census report to the President, who in turn determined the number of Representatives due each state and reported that decision to Congress. The Court concluded that the actions of the Secretary were not final, reasoning that "the Secretary's report to the President carries no direct consequences ... it serves more like a tentative recommendation than a final and binding determination...." *Id.* —— U.S. at ——, 112 S.Ct. at 2774. As the *Franklin* Court recognized, the action that has a direct effect is the President's statement to Congress, not the Secretary's report to the President, because nothing barred the President from directing the Secretary to change the census.

The Third Circuit in ruling on a similar challenge to the actions taken under the Base Closure Act held that judicial review of Presidential action is banned under the APA, but held that judicial review is available to determine whether the President had constitutional or statutory authority for whatever action was taken. *Specter v. Garrett,* 995 F.2d 404 (3rd Cir.1993).

■ However, this action challenges the action of the Secretary in carrying out his responsibilities under the Base Closure Act. As in *Franklin,* the acts of the Secretary of Defense and the Commission in preparing the recommendations are not final agency action and are not subject to review under the APA. The report of the Commission recommending closures and realignments, like the census report of the Secretary, is not

858

binding on the President and does not have any direct consequences since it takes effect only if the President accepts it and Congress does not disapprove it. The President has the authority to request revisions to the Commission's report and to reject the Commission's recommendations, thereby terminating a base-closing cycle altogether. *Cohen v. Rice*, 992 F.2d 376, 381–82 (1st Cir. 1993).

The Secretary of Defense plays a preliminary role in the closure and realignment process. The President bases his approval and disapproval on the report of the Commission, rather than the Secretary's list of recommended closures and realignments. Accordingly, the Secretary's recommendations, like those of the Commission, do not constitute final agency action under *Franklin*.

As the plaintiffs have no standing to bring this action and cannot review the actions of the Secretary, there is no useful purpose in addressing the other issues raised by the parties.