USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-2427 WILLIAM S. COHEN, ET AL., Plaintiffs, Appellants, v. DONALD RICE, SECRETARY OF THE AIR FORCE, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ____________________ Before Boudin, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Severin M. Beliveau, with whom Ann R. Robinson, Joseph G. _____________________ _________________ __________ Donahue, and Preti, Flaherty, Beliveau & Pachios, were on brief for _______ ____________________________________ appellants. Jacob M. Lewis, with whom Stuart M. Gerson, Acting Attorney _______________ _________________ General, Richard S. Cohen, United States Attorney, Douglas N. Letter, _________________ _________________ United States Attorney and Scott R. McIntosh, United States Attorney, __________________ were on brief for appellee. ____________________ May 3, 1993 ____________________ STAHL, Circuit Judge. This is an action to enjoin _____________ the Department of Defense from carrying out the President's decision to close Loring Air Force Base ("Loring") in Limestone, Maine. Plaintiffs,1 seeking relief under the Administrative Procedure Act ("APA"), 5 U.S.C. 701 et seq., __ ____ allege that defendants Secretary of Defense, Secretary of the Air Force, and Base Closure and Realignment Commission ("the Commission") violated procedural and substantive requirements of the Defense Base Closure and Realignment Act of 1990 ("the 1990 Act"). Pub. L. No. 101-510, 2901-11, 104 Stat. 1808- 19 (codified at 10 U.S.C. 2687). In dismissing many of the plaintiffs' claims in May 1992, the district court ruled that the 1990 Act precludes judicial review of substantive challenges to base closure decisions. See Cohen v. Rice, 800 ___ _____ ____ F. Supp. 999 (D. Me. 1992) ("Cohen I"). In September of _______ 1992, the district court granted defendants' motion for summary judgment on the remaining claims on the basis of the ____________________ 1. Plaintiffs are: United States Senators William S. Cohen and George J. Mitchell; Maine Governor John R. McKernan, Jr.; United States Representative Olympia J. Snowe; the towns of Limestone, Ashland, Caswell, Fort Fairfield, Mars Hill, New Sweden and Van Buren, and the cities of Caribou, and Presque Isle, all of which are municipalities of the State of Maine; Aroostook County, a political subdivision of the State of Maine; Save Loring Committee, an organization of individual and corporate citizens residing in the plaintiff towns and cities, and Committee Chairman Paul D. Haines; and American Federation of Government Employees ("AFGE") Local Union Chapter #2943, the exclusive bargaining representative for approximately 492 Loring employees and Chapter President Alan Mulherin. -2- 2 Supreme Court's intervening decision in Franklin v. ________ Massachusetts, 112 S. Ct. 2767 (1992). See Cohen v. Rice, _____________ ___ _____ ____ 800 F. Supp. 1006 (D. Me. 1992) ("Cohen II"). Plaintiffs' _________ timely appeal focuses on the district court's application of Franklin to this case. After careful review of the decision ________ below, the 1990 Act, and the Court's pronouncements in Franklin, we affirm the judgment of the district court. As ________ this case is apparently the first at the appellate level to mesh the 1990 Act with the recent dictates of Franklin,2 we ________ begin with an overview of the 1990 Act and its predecessors, and then focus on the specifics of the matter at hand. The 1990 Act The 1990 Act ____________ The 1990 Act is the latest attempt by Congress to regulate the process by which domestic military bases are closed or realigned. Throughout the 1960s and 1970s, the Executive Branch attempted to reduce military expenditures by closing or realigning military bases. See Defense Base ___ Closure and Realignment Commission, Report to the President, _______________________ ("Commission Report") at 1-1 (1991). Often, however, these ____________________ 2. One other appellate court has addressed the issue we face today, deciding, at least partially, in favor of judicial review. See Specter v. Garrett, 971 F.2d 936 (3rd Cir. ___ _______ _______ 1992). The district court, in fact, relied on Specter in _______ ruling on defendants' motion to dismiss. Subsequently, however, following the issuance of Franklin, the Court ________ granted the government's petition for certiorari in Specter, _______ vacated the judgment therein, and remanded the case to the Third Circuit for reconsideration in light of Franklin. See ________ ___ O'Keefe v. Specter, 113 S. Ct. 455 (1992). _______ _______ -3- 3 attempts were opposed by members of Congress, who feared the economic impact on their constituents, and who suspected the influence of political motivation in the Executive's decisions. Id. ___ In 1977, Congress passed legislation granting the Secretary of Defense the power to unilaterally close particular bases, but only after (1) notifying the Armed Services Committees of the Senate and House of Representatives of the selected bases; (2) submitting to the committees his evaluation of the economic, environmental, budgetary and strategic consequences of the closings; and (3) deferring action for at least 60 days, during which time Congress could legislate a halt to the closures. See 10 ___ U.S.C. 2687(b) (Supp. IV 1980). In addition, the proposed closures had to comply with the requirements of the National Environmental Policy Act of 1969 ("NEPA"). Id. While the ___ 1977 legislation imposed few substantive restrictions on the Executive Branch's authority to close bases, the procedural requirements--most notably the mandate to comply with NEPA-- made such action difficult. See Commission Report at 1-1; ___ __________________ see also H.R. Conf. Rep. No. 1071, 100th Cong., 2d Sess. 23 ___ ____ (1988), reprinted in 1988 U.S.C.C.A.N. 3395, 3403 ("[t]he _________ __ conferees recognize that [NEPA] has been used in some cases to delay and ultimately frustrate base closures . . . ."). -4- 4 Congress next tackled the base closure issue in 1988 by enacting the Defense Authorization Amendments and Base Closure and Realignment Act ("the 1988 Act"). Pub. L. No. 100-526, 201-209, 102 Stat. 2623, 2627-34 (1988). The 1988 Act replaced the Secretary of Defense's decision-making power with that of an independent commission, which was granted the power to recommend bases for closure or realignment. 1988 Act 201, 203(b)(1)-(2), 102 Stat. at 2627-28. The commission presented its recommendations to the Secretary, who had the power to approve or disapprove the entire group of recommendations. Id. 201(1)-(2), 202(a), ___ 102 Stat. 2627. If the Secretary approved the commission's recommendations, Congress was given 45 days to override the Secretary by passing a joint resolution. Id. 202(b), 208, ___ 102 Stat. 2627, 2632-34. Finally, in response to the prior difficulties, the 1988 Act explicitly exempted the Secretary and commission's base closure decisions from the requirements of NEPA. Id. 204(c)(1), 102 Stat. 2630. ___ Although the newer processes of the 1988 Act led to closure or realignment of 145 domestic military bases, it was not enacted as a permanent mechanism, but was instead a one- time exception to the procedures set forth in the 1977 legislation. See Specter, 971 F.2d at 939. Thus, the ___ _______ Defense Secretary's January 1990 base closure proposals were governed by the 1977 rules. Id. Members of Congress ___ -5- 5 expressed concern over the "considerable period of time and . . . numerous opportunities for challenges in court[]" presented by the 1977 procedures, and noted that the Secretary's list of bases for study "raised suspicions about the integrity of the base closure selection process." H.R. Conf. Rep. No. 923, 101st Cong., 2nd Sess. 705 (1990), reprinted in 1990 U.S.C.C.A.N. 2931, 3257. _________ __ Congress, in enacting the 1990 Act, attempted to incorporate the procedures of the 1988 Act, without the obstacles of prior legislation. See H.R. Rep. No. 665, 101st ___ Cong., 2d Sess. 342 (1990), reprinted in 1990 U.S.C.C.A.N. _________ __ 2931, 3068 ("a new base closure process will not be credible unless the 1988 base closure process remains inviolate"). The 1990 Act envisioned three rounds of base closures, in 1991, 1993, and 1995, and provided for the establishment of an independent Commission to meet in each of those years. 1990 Act 2902(a), (e), 104 Stat. 1808 (1990). The Act required the Secretary of Defense to provide Congress and the Commission with a six-year force structure plan that assessed national security threats and the force structure necessary to meet such threats. Id. 2903(a)(1)-(3), 104 Stat. 1810 ___ (1990). The Secretary was also required to formulate criteria for use in identifying bases for closure or realignment. The criteria had to be published in the Federal Register for public notice and comment, and submitted to -6- 6 Congress which had the power to evaluate and disapprove them. Id. 2903(b), 104 Stat. 1810-11.3 ___ ____________________ 3. On February 15, 1991, the Department of Defense published eight proposed final criteria governing base closure and realignment. 56 Fed. Reg. 6374. The criteria were subject to Congressional review until March 15, 1991, and became final on that date. 1990 Act 2903(b)(2). The criteria are reported as follows: In selecting military installations for closure or realignment, the Department of Defense, giving priority consideration to military value (the first four criteria below), will consider: Military Value Military Value ______________ 1. The current and future mission requirements and impact on operational readiness of the Department of Defense's total force. 2. The availability and condition of land, facilities and associated air space at both the existing and potential receiving locations. 3. The ability to accommodate contingency, mobilization and future total force requirements at both the existing and potential receiving locations. 4. The cost and manpower implications. Return on Investment Return on Investment ____________________ 5. The extent and timing of potential cost and savings, including the number of years, beginning with the date of completion of the closure or realignment, for the savings to exceed the cost. Impacts Impacts _______ 6. The economic impact on communities. 7. The ability of both the existing and potential receiving communities' infrastructure to support forces, missions and personnel. 8. The environmental impact. 56 Fed. Reg. 6374-02 (Feb. 15, 1991). -7- 7 For the 1991 cycle, the Act required the Secretary to recommend base closures and realignments to the Commission by April 15, 1991, based on the force structure plan and final criteria. Id. 2903(c)(1), 104 Stat. 1811. The Act ___ charges the Commission with reviewing the Secretary's recommendations, holding public hearings, and preparing a report for the President containing its assessment of the Secretary's proposals and its own recommendations. Id. ___ 2903(d)(1)-(2)(A), 104 Stat. 1811. The Act allows the Commission to change any of the Secretary's recommendations if they "deviate[] substantially" from the force structure plan and final criteria. Id. 2903(d)(2)(B), 104 Stat. ___ 1811-12. However, in its report to the President, the Commission must explain any departure from the Secretary's recommendations. Id. 2903(d)(3), 104 Stat. 1812. The ___ Secretary must make available to the Comptroller General all information used in making the initial recommendations. The Comptroller General must report on the Secretary's recommendations and selection process to the Commission and Congress, and may, to the extent requested, assist the Commission. Id. 2903(c)(4), (d)(5), 104 Stat. 1811-12. ___ Once the Commission completes its report, the Act requires that it be transmitted to the President, who may approve or disapprove the Commission's recommendations, and then must relate his decision to the Commission and Congress. -8- 8 Id. 2903(e)(1)-(3), 104 Stat. 1812. If the President ___ disapproves the Commission's recommendations, in whole or in part, he returns them to the Commission, which must then reconsider its prior recommendations and submit a revised list to the President. Id. 2903(e)(3), 104 Stat. 1812. If ___ the President does not approve the revision, and thereby does not submit any recommendations to Congress, the base closure process for that year is terminated. Id. 2903(e)(5). If, ___ however, the President approves the Commission's recommendations, or its revised version, Congress has 45 days to pass a joint resolution disapproving the Commission's recommendations in their entirety. Id. 2908, 104 Stat. ___ 1816-18. If a disapproval resolution is enacted, the Secretary may not close the bases approved for closure by the President. Id. 2904(b), 104 Stat. 1813. If Congress does ___ not pass such a resolution, the Act calls for the Secretary to close or realign all bases so recommended by the Commission and approved by the President. Id. 2904(a), 104 ___ Stat. 1812-13. The Loring Decision The Loring Decision ___________________ In April 1991, the Secretary issued his list of recommended domestic base closures and realignments. See 56 ___ Fed. Reg. 15184 (April 15, 1991). Among the 72 military installations on the list were 20 Air Force bases. Loring was scheduled for closure. Id. at 15252. Pursuant to the ___ -9- 9 Act, the Commission then conducted its analysis and review of the Secretary's recommendations. The Commission conducted public hearings, at which it heard testimony from Department of Defense officials, legislators, and other experts. Commission Report at 4-1, (G-1)-(G-2). Commissioners also visited many of the affected bases, including Loring. Id. at ___ 4-1, H-1. The Commission's staff reviewed the military services' methodologies and data used to develop their recommendations. Id. In addition, the General Accounting ___ Office ("GAO") issued a report on the Secretary's recommendation and forwarded it to the Commission, while also assisting the Commission in obtaining, verifying and reviewing data. Id. at (3-1)-(3-2). In the end, the ___ Commission recommended that one of the Air Force bases targeted for closure by the Secretary remain open, but the Commission concurred in the recommendation that Loring be closed. Id. at (5-31)-(5-45). ___ On July 10, 1991, President Bush approved the recommendations of the Commission, including the closure of Loring. See Cohen I, 800 F. Supp. at 1002; Cohen II, 800 F. ___ _______ ________ Supp. at 1008. On July 30, 1991, pursuant to section 2908 of the 1990 Act, the House considered a resolution, proposed by plaintiff Rep. Snowe, to disapprove the Commission's recommendations. Id. Three Commissioners, Air Force ___ officials, and members of the affected communities testified -10- 10 at the hearings. 137 Cong. Rec. H6006 (daily ed. July 31, 1991). During the course of debate, Representative Snowe urged the House to block Loring's closure, alleging a variety of procedural errors on the part of the Commission. Id. at ___ H6012-H6020. The House rejected the proposed disapproval resolution by a vote of 364 to 60, thus requiring the Secretary to proceed with the 1991 closures and realignments. Id. at H6039. ___ Prior Proceedings Prior Proceedings _________________ Plaintiffs filed the instant suit in December 1991, alleging in Count I that the Air Force failed to adhere to the force structure plan and "deviated substantially" from the published base closure criteria; failed to fairly apply the selection criteria; improperly considered an unapproved selection criterion; acted "arbitrarily and capriciously" in applying the selection criteria to Loring and a rival base; and failed to supply all relevant information to the GAO and Congress. Count II made many of the same allegations against the Commission, and also alleged a failure to comply with the 1990 Act's public hearing requirement. In February 1992, the defendants moved to dismiss the suit, essentially on the ground that the 1990 Act implicitly precluded judicial review. Cohen I, 800 F. Supp. _______ at 1005. With respect to Count I, the district court dismissed all claims against the Air Force and Secretary, -11- 11 except those containing allegations that the Secretary failed to transmit to the GAO, Congress and the Commission all of the information used in preparing his recommendations, as the 1990 Act requires. Id. The court ruled that the remainder ___ of plaintiffs' challenges were not judicially reviewable because they would require the court to "reevaluate the basis for the Secretaries' decision to close Loring. . . ." Relying on Specter, the court held that such review was _______ precluded by the Act, which "decided to put these questions to rest and guaranty the integrity of the process not through judicial review, but through review by two bodies far more suited to the task: the Commission and the GAO." Id. at ___ 1005 (quoting Specter, 971 F.2d at 951). The district court _______ also dismissed most of the claims against the Commission made in Count II, for essentially the same reasons. Id. at 1006. ___ Only the charge that the Commission failed to hold public hearings, in violation of section 2903(d)(1) of the 1990 Act, was left standing. Id. ___ Subsequent to Cohen I, the Supreme Court, in ________ Franklin, expressed its interpretation of reviewable agency ________ action under the APA. The district court, relying on Franklin, granted defendants' motion for summary judgment on ________ the remaining aspects of the case. See Cohen II. This ___ ________ appeal followed. Before delving into Franklin and its ________ -12- 12 applicability herein, we briefly outline the strictures of the APA. The Administrative Procedure Act The Administrative Procedure Act ________________________________ The APA sets forth the procedures by which federal agencies are held accountable to the public and their actions made subject to judicial review. Franklin, 112 S. Ct. at ________ 2773. Pursuant to the APA, a court may set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or contrary to applicable legal or procedural requirement. 5 U.S.C. 706(2). Such review, however, is only available "`to the extent that . . . statutes [do not] preclude judicial review' and the agency action `is [not] committed to agency discretion by law.'" Cohen II, 800 F. _________ Supp. at 1009 (quoting 5 U.S.C. 701(a)). Finally, and perhaps most importantly, the APA authorizes judicial review only of "final agency action for which there is no other _____ adequate remedy in a court." 5 U.S.C. 704 (emphasis added). At the heart of the instant dispute is whether the actions complained of are "final actions" within the meaning of the APA. In Franklin, the Court addressed this critical ________ issue. We turn now to the Court's opinion. Franklin v. Massachusetts Franklin v. Massachusetts _________________________ Franklin involved a challenge to the ________ reapportionment of the House of Representatives following the 1990 census. Article I, 2, cl. 3, of the Constitution -13- 13 provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers . . . ." Section 2 of the Fourteenth Amendment mandates counting the "whole number of persons in each state." Such counting is to be done through "actual Enumeration," conducted every 10 years, "in such Manner as [Congress] shall by Law direct." U.S. Const., art I, 2, cl. 3. Pursuant to statutory authority, the Secretary of Commerce is directed to conduct the decennial census "in such form and content as he may determine." 13 U.S.C. 141(a). The Secretary then must provide the President with the state-by-state population, necessary for reapportionment. Id. 141(b). The President ___ then sends Congress a statement, based on the Secretary's report, showing the population of each state, and the number of Representatives to which each state is entitled, according to a specified formula. 2 U.S.C. 2a(a). Each state is entitled to the number of Representatives shown in the President's statement to Congress. Id. 2a(b). See ___ ___ generally Franklin, 112 S. Ct. at 2771 (outlining historical _________ ________ bases of apportionment and census statutes). The Commonwealth of Massachusetts challenged the Secretary of Commerce's inclusion of military personnel serving overseas in state population counts for census purposes. The resulting tabulation shifted a Representative from Massachusetts to Washington. Id. Massachusetts claimed ___ -14- 14 that the allocation of overseas personnel was arbitrary and capricious under the APA. A three-judge district court panel agreed. Commonwealth v. Mosbacher, 785 F. Supp. 230 (D. ____________ _________ Mass. 1992). The Supreme Court reversed, holding that the action of the Secretary, in reporting the population tabulations, was not "final," within the meaning of the APA, while the actions of the President were not subject to APA review because the President is not an "agency" within the APA. Franklin, 112 S. Ct. at 2773-76. ________ In assessing the finality of the Commerce Secretary's actions,4 the Court first looked to Abbott Lab. ___________ v. Gardner, 387 U.S. 136 (1967). There, the Court stated _______ that the finality of agency action depends on whether its impact `"is sufficiently direct and immediate' and has a `direct effect on . . . day-to-day business.'" Franklin, ________ 112 S. Ct. at 2773 (quoting Abbott, 387 U.S. at 152). "An ______ agency action is not final if it is only `the ruling of a subordinate official' or `tentative.'" Id. (quoting Abbott, ___ ______ 387 U.S. at 151). "The core question is whether the agency has completed its decisionmaking [sic] process, and whether the result of that process is one that will directly affect the parties." Id. In answering this "core question," the ___ ____________________ 4. Here, plaintiffs have expressly conceded that they are not attacking the actions of the President. Thus, we focus our discussion on Franklin's assessment of the Secretary of __________ Commerce's actions. -15- 15 Court first reasoned that the census statute, unlike others, does not explicitly require the President to transmit the agency's report to Congress. Id. The Court stated: ___ After receiving the Secretary's report, the President is to "transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population." 2 U.S.C. 2a. Section 2a does not expressly require the President to use the data in the Secretary's report, but, rather, the data from the "decennial census." There is no statute forbidding amendment of the "decennial census" itself after the Secretary submits the report to the President. Id. at 2774. ___ Therefore, according to the Court, the census itself still presents a "moving target" after the Secretary reports to the President, especially since there exists no statutory bar to the President instructing the Secretary to reform the census, even after the President receives the Secretary's report. Id. "It is not until the President ___ submits the information to Congress that the target stops moving, because only then are the States entitled by 2a to a particular number of Representatives." Id. Thus, the ___ Court concluded: "Because the Secretary's report to the President carries no direct consequences for the reapportionment . . . serv[ing] more like a tentative recommendation than a final and binding determination[,] [i]t is, like `the ruling of a subordinate official,' not final -16- 16 and therefore not subject to review." Id. (quoting Abbott, ___ ______ 387 U.S. at 151). We agree with the district court's conclusion that "[t]he holding and reasoning of Franklin are directly ________ applicable to the facts of the present controversy." Cohen _____ II, 800 F. Supp. at 1011. In arriving at its decision, the __ Franklin Court explicitly distinguished statutory schemes ________ whereby the President is required to transmit an agency's ________ report directly to Congress from those in which the President is not so required, holding that the former represent final agency action, under the APA, but that the latter do not. Under the 1990 Act, the President is not required to submit the Commission's report to Congress. In addition, the 1990 Act gives the President the power to order the Commission to revise its report, and, in the final analysis, the President has the power to terminate a base closure cycle altogether via a second rejection of a Commission report. In our view, the agency action involved here bears even less indicia of finality than that in Franklin, where the majority ________ referred to the President's role in reapportionment as "admittedly ministerial," id. at 2775, yet still found the ___ President's action to be the "final action." Id. ___ Plaintiffs seek to avoid Franklin's restrictions by __________ arguing that this case involves a challenge to the Commission's faulty procedures, e.g., failing to hold public __________ -17- 17 hearings and failing to provide information to Congress and the GAO, whereas Franklin, according to plaintiffs, ________ proscribes only challenges to an agency's substantive decisions. As an initial matter, we note that Franklin makes _________ no such distinction. In any event, we view it as a distinction without legal difference. As previously noted, Franklin's finality determination explored whether an agency __________ action has a "sufficiently direct and immediate" impact. Here, if the Commission's report to the President is not a "final action," then the techniques used by the Commission to create the report, which are even more preliminary to the final decision, cannot themselves be "final agency actions." In sum, whether the complaints are styled as procedural or substantive, our answer to the "core question" of finality remains the same. The judgment of the district court is therefore affirmed.5 affirmed. _________ ____________________ 5. Because we have based our decision on Franklin's finality __________ analysis, we need not address whether the 1990 Act, by its own terms, precludes judicial review. -18- 18