Sen. Arlen SPECTER; Sen. Harris Wofford; Sen. Bill Bradley; Sen. Frank R. Lautenberg; Governor Robert P. Casey; Commonwealth of Pennsylvania; Ernest D. Preate, Jr., Pennsylvania Attorney General; Rep. Curt Weldon, Rep. Thomas Foglietta; Rep. Robert Andrews; Rep. R. Lawrence Coughlin; City of Philadelphia; Howard J. Landry; International Federation of Professional and Technical Engineers, Local 3, William F. Reil; Metal Trades Council, Local 687 Machinists; Governor James J. Florio; State of New Jersey; Robert J. Del

Tufo, New Jersey Attorney General; Governor Michael N. Castle; State of Delaware; Rep. Peter H. Kostmeyer; Rep. Robert A. Borski, Ronald Warrington; Planners Estimators Progressman & Schedulers Union Local No. 2

v.

H. Lawrence GARRETT, III, Secretary of the Navy; Richard Cheney, Secretary of Defense; The Defense Base Closure and Realignment Commission, and its Members; James A. Courter; William L. Ball, III; Howard H. Callaway; Duane H. Cassidy; Arthur Levitt, Jr.; James C. Smith, II; Robert D. Stuart, Jr.,

U.S. Sen. Arlen Specter, U.S. Sen. Harris Wofford, U.S. Sen. Bill Bradley, U.S. Sen. Frank R. Lautenberg, Governor Robert P. Casey, the Commonwealth of Pennsylvania, Pennsylvania Attorney General Ernest D. Preate, Jr., Governor James J. Florio, the State of New Jersey, New Jersey Attorney General Robert J. Del Tufo, Governor Michael N. Castle, the State of Delaware, U.S. Rep. Curt Weldon, U.S. Rep. Thomas Foglietta, U.S. Rep. Robert E. Andrews, U.S. Rep. R. Lawrence Coughlin, U.S. Rep. Peter H. Kostmayer, U.S. Rep. Robert A. Borski, the City of Philadelphia, Howard J. Landry, International Federation of Professional and Technical Engineers, Local 3, William F. Reil, Metals Trades Council, Local 687, Machinists, Ronald Warrington, the Planners Estimators Progressman & Schedulers Union, Local No. 2, Appellants.

No. 91–1932.

United States Court of Appeals, Third Circuit.

Reargued Feb. 24, 1993.

Decided May 18, 1993.

Sur Petition for Rehearing June 14, 1993.

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Bruce W. Kauffman (argued), David H. Pittinsky, Camille Wolf Spiniello, Patrick T. Davish, Mark A. Nation, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA (Senator Arlen Specter (argued), of counsel), for appellants.

Ernest D. Preate, Jr., Atty. Gen., Louis J. Rovelli, Executive Deputy Atty. Gen., Harrisburg, PA, for Com. of Pennsylvania and Ernest D. Preate, Jr.

Robert J. Del Tufo, Atty. Gen. of New Jersey, Jack M. Sabatino, Asst. Atty. Gen. of the State of New Jersey, Howard J. McCoach, Deputy Atty. Gen. for the State of New Jersey, Trenton, NJ, for State of N.J., Governor James J. Florio and Robert J. Del Tufo.

Charisse Lillie, Sol. for the City of Philadelphia, Philadelphia, PA, for City of Philadelphia.

Stuart M. Gerson, Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., Douglas N. Letter (argued), Scott R. McIntosh, Jennifer H. Zacks, Attorneys, Appellate Staff, Civ. Div., Dept. of Justice, Washington, DC, for appellees.

BEFORE: STAPLETON, SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This action to enjoin the defendants from carrying out a decision to close the Philadelphia Naval Shipyard is before us for the second time. In our initial opinion in this case, *Specter v. Garrett,* 971 F.2d 936 (3d Cir.1992), we held, *inter alia,* that plaintiffs' claim that the closing of the Shipyard would be illegal because it would be the product of a process inconsistent with certain procedural mandates of the Defense Base Closure and Realignment Act of 1990 could proceed in the district court. Our mandate, however, was vacated by the Supreme Court, —— U.S. ——, 113 S.Ct. 455, 121 L.Ed.2d 364 and the case was remanded for reconsideration in light of *Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). After consideration of the impact of *Franklin* upon our prior holding, we conclude that no change in that holding is warranted. We will therefore remand this matter to the district court for further proceedings consistent with our earlier opinion.

## I.

### A.

In *Franklin,* the Supreme Court was presented with a situation at least superficially similar to the one before us; however, it is the differences between the two cases that we find dispositive. *Franklin* was a suit against the President, the Secretary of Commerce, and a number of other public officials challenging the methods used in the 1990 census and the manner in which the number of seats in the House of Representatives had been allocated to the various states. Plaintiffs' claims were based upon the Administrative Procedure Act (APA) and the Constitution. A three judge panel of the United States District Court for the District of Massachusetts initially found in favor of the plaintiffs and granted the relief sought—relief which included an injunction directing the Secretary of Commerce to alter her reapportionment report and the President to recalculate the number of Representatives per State

and transmit the new calculation to Congress. *Franklin,* —— U.S. at ——, 112 S.Ct. at 2770.

The Supreme Court reversed. It first analyzed plaintiffs' claim under the APA which allows review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (1988). The Court concluded that the Secretary of Commerce's report to the President on the results of the census does not constitute "final agency action" and is therefore unreviewable under the APA because "[t]he President, not the Secretary takes the final action that affects the States." *Franklin,* —— U.S. at ——, 112 S.Ct. at 2775; *see also id.* at ——, 112 S.Ct. at 2773 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). Next, the Court held that although the President's calculation of the number of Representatives and forwarding of that calculation to Congress is a final action, the President is not an "agency" within the meaning of the Act and thus, the President's action is not reviewable for abuse of discretion under the APA. *Id.* at ——, 112 S.Ct. at 2775. Finally, the Court noted that there is judicial review of presidential action to determine whether it violates the Constitution; however, it concluded that the action complained of in *Franklin* was not unconstitutional.

### B.

The action currently before us is a suit against the Secretary of the Navy, the Secretary of Defense, and the Defense Base Closure Commission seeking to enjoin the closing of the Philadelphia Naval Shipyard.[1] Under the Defense Base Closure and Realignment Act of 1990 ("the Act"), it is the responsibility of the Secretary of Defense to close the bases designated as a result of the process prescribed by the Act, Pub.L. No. 101–510, §§ 2904–2905, 104 Stat. 1808, 1812–14 (1990), and the primary relief sought here is an order enjoining the Secretary from closing the Shipyard. The alleged basis for this relief is that the process that resulted in

---

1. The President is not a defendant in this suit.

the designation of the Shipyard as a base to be closed did not comply with the requirements set forth in the Act.

In our prior opinion, we first held that there could be no judicial review prior to the end of the process required by the Act because there was no final decision prior to that point that had an adverse impact on the plaintiffs.[2] We also concluded that the decisionmaking of the President under the Act was committed to his discretion and not properly reviewable. *Specter,* 971 F.2d at 946 ("One can also say with confidence that Congress intended no judicial review of the manner in which the President has exercised his discretion in selecting bases for closure....")。 Similarly, we held that the decisionmaking of other federal officials (i.e. the Secretary of Defense, the members of the Commission) challenged by plaintiffs was committed to their discretion and not judicially reviewable. *Id.* at 950–53. However, we also held that the district court could review the claim that the closing of the Shipyard would be illegal because it would be the product of a process inconsistent with certain procedural mandates of the Act.[3] Specifically, we concluded:

[W]hile Congress did not intend courts to second-guess the Commander-in-Chief, it did intend to establish exclusive means for closure of domestic bases. § 2909(a). With two exceptions, Congress intended that domestic bases be closed *only* pursuant to an exercise of presidential discretion *informed by recommendations of the nation's military establishment and an independent commission based on a common and disclosed (1) appraisal of military need, (2) set of criteria for closing, and (3) data base.* Congress did not simply delegate this kind of decision to the President and leave to his judgment what advice and data he would solicit. Rather, it established a specific procedure that would ensure balanced and informed advice to be considered by the President and by Congress before the executive and legislative judgments were made.

*Id.* at 947 (footnote omitted).

Although we noted that because "it is the implementation of the President's decision that we have been asked to enjoin, ... at least in one sense, we are here asked to review a presidential decision," *id.* at 945, we concluded that this would not bar review of plaintiffs' procedural claims:

Even if the APA does not apply to decisions of the President, however, its provisions concerning judicial review represent a codification of the common law, 5 Kenneth C. Davis, *Administrative Law* 28:4 (1984), *cited with approval in Heckler v. Chaney,* 470 U.S. 821, 832 [105 S.Ct. 1649, 1656, 84 L.Ed.2d 715] (1985); *see also ICC v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 282 [107 S.Ct. 2360, 2367, 96 L.Ed.2d 222] (1987) (APA "codifies the nature and attributes of judicial review"), and actions of the President have never been considered immune from judicial review solely because they were taken by the President. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 [72 S.Ct. 863, 96 L.Ed. 1153] (1952); *Panama Refining Co. v. Ryan,* 293 U.S. 388 [55 S.Ct. 241, 79

---

**2.** More specifically, we held that action could be judicially reviewed "only if its impact upon plaintiffs is direct and immediate.... One can rarely if ever be injured by a base closing prior to a decision having been made to close that base. The actions of the Secretary and the Commission prior to the President's decision are merely preliminary in nature." *Specter,* 971 F.2d at 946.

**3.** For instance, we held that the allegation that "the Secretary failed to create and transmit to the Commission and the GAO an administrative record containing all of the information the Secretary relied upon in making his recommendations" as required by § 2903(c)(4) of the Act was judicially reviewable. *Specter,* 971 F.2d at 952. Similarly, we also held reviewable the plaintiffs' contention "that the Act requires the Commis-

sion to base its decision solely on the Secretary's administrative record and the transcript of the public hearings, and that the Commission went beyond this record by holding closed-door meetings with the Navy." *Id.* at 952–53.

We stressed, however, that the extent of judicial review in this context was very limited and that plaintiffs, while purporting to complain about specific procedural defects, were in large part seeking to get the district court to second guess decisions committed by the Act to executive discretion. *Id.* at 953. It is apparent to us from plaintiffs' Brief for Appellants on Remand that plaintiffs have failed to acknowledge the limited character of the review our prior opinion permits.

L.Ed. 446] (1935); *see also INS v. Chadha*, 462 U.S. 919, 953 n. 16 [103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317] (1983) ("[e]xecutive action under legislatively delegated authority . . . is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review"); *Nixon v. Fitzgerald*, 457 U.S. 731, 781[, 102 S.Ct. 2690, 2717, 73 L.Ed.2d 349] (1982) (White, J., dissenting) ("it is the rule, not the exception, that executive actions—including those taken at the immediate direction of the President—are subject to judicial review"). . . . It follows that our conclusions with respect to the availability of judicial review in this case will be the same whether or not the APA applies to presidential decisionmaking.

*Id.* at 945.

### III.

Examination of our prior decision in light of *Franklin* suggests to us that no change in outcome is required. *Franklin's* holding that the Secretary of Commerce's report to the President did not constitute a reviewable final action because it did not have an immediate and direct impact on the plaintiffs confirms our initial conclusion that there was no reviewable final action here until after the President designated the Shipyard as a facility to be closed and Congress failed to overturn that action. *See Specter*, 971 F.2d at 945 ("We think it can be said with confidence that Congress intended no judicial review of decisions under the Act prior to the effective date of the President's decision, i.e., the first date upon which the Secretary can carry out any closure or realignment under § 2904(b).").

More importantly, the Court's conclusion that the President is not an "agency" under the APA, and thus, presidential action is not reviewable for abuse of discretion under the APA's standards is entirely consistent with our prior decision in which we assumed, without deciding, that the President is not an

agency within the meaning of the APA.[4] Because our prior holding was not based on the existence of APA abuse of discretion review, but rather on the belief that courts may review actions taken at the direction of the President to determine whether those actions are within applicable constitutional and statutory authority, a modification of our prior mandate only would be warranted if *Franklin* might be read as foreclosing the limited review we previously upheld.

In *Franklin*, the Court declined only to review the President's decision under the APA. It expressly sanctioned judicial review of presidential decision making for consistency with the Constitution and said nothing about review of presidential action for consistency with the statute authorizing such action. In concluding in our earlier opinion that judicial review was available here, we relied upon the existence of judicial review prior to the adoption of the APA and upon various authorities indicating that the judicial review provisions of the APA represent a "codification of the common law." *Id.* at 945. While we there described this extra-APA review as common law review, our reexamination of the relevant authorities in light of *Franklin* has persuaded us that there is a constitutional aspect to the exercise of judicial review in this case—an aspect grounded in the separation of powers doctrine. As a result, we believe *Franklin* provides affirmative support for judicial review in this case. We would, in any event, be reluctant to infer from *Franklin's* silence on the matter a prohibition of judicial review where presidential action is alleged to be in conflict with nondiscretionary mandates of the authorizing statute because the Court had no occasion to consider that issue in *Franklin*. There, the only non-constitutional allegation made by (and, indeed, available to) plaintiffs was that the proposed action represented an abuse of discretion (*i.e.*, arbitrary and capricious conduct) prohibited by the APA. Here, by contrast, plaintiffs allege that the process underlying the decision to close the Shipyard violated specific nondiscretionary provisions of

---

**4.** As previously noted, we explicitly concluded that our holding permitting review of plaintiffs' claims that the base closing process had violated the specific procedural mandates of the statute would be "the same whether or not the APA applies to presidential decisionmaking." *Specter*, 971 F.2d at 945.

the Base Closing Act—the only authority advanced by the defendants for the closing.

We read *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), to stand for the proposition that the President must have constitutional or statutory authority for whatever action he wishes to take and that judicial review is available to determine whether such authority exists. *See id.* at 585, 72 S.Ct. at 866; *see also United States v. Noonan*, 906 F.2d 952, 955 (3d Cir.1990) ("It is well established under our tripartite constitutional system of government that the President stands under the law. The President's power, if any ... must stem from an act of Congress or from the Constitution itself." (citing *Youngstown Sheet* )); *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 611 (D.C.Cir. 1974) (" '*Youngstown* represents the Judicial power, by compulsory process or otherwise, to prohibit the Executive from engaging in actions contrary to law. *Youngstown* represents the principle that no man, cabinet minister, or Chief Executive himself, is above the law.' " (quoting *Nixon v. Sirica*, 487 F.2d 700, 793 (Wilkey, J., dissenting))). *Youngstown* also stands for the proposition that it is the constitutionally-mandated separation of powers which requires the President to remain within the scope of his legal authority. *See, e.g., National Treasury Employees Union*, 492 F.2d at 604 ("[T]he judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch."); *see also* U.S. Const. Art. II, § 3 ("[T]he President shall take care that the laws be faithfully executed...."). Indeed, we note that the *Youngstown* Court, in invalidating the President's action, explicitly noted that the President was statutorily authorized to seize property under certain conditions, but that those conditions were not met in the case before it. *Youngstown*, 343 U.S. at 585–86, 72 S.Ct. at 866. Because a failure by the President to remain within statutorily mandated limits exceeds, in this context as well as that of *Youngstown*, not

only the President's statutory authority, but his constitutional authority as well, our review of whether presidential action has remained within statutory limits may properly be characterized as a form of constitutional review. That such constitutional review exists is explicitly reaffirmed by *Franklin*. —— U.S. at ——, 112 S.Ct. at 2776 (citing *Youngstown*).

■ The plaintiffs in this case, unlike the plaintiffs in *Franklin*, do not ask the court to review under the APA for arbitrary and capricious conduct. Rather, they allege that closing the Shipyard would be inconsistent with specific, nondiscretionary directives of the Base Closing Act—the only authority advanced by the defendants for their proposed action. The President, no less than his lieutenants, must have statutory or constitutional authority for his actions and where, as here, the only available authority has been expressly confined by Congress to action based on a particular type of process, judicial review exists to determine whether that process has been followed.[5]

## IV.

The defendants insist that there can be no judicial review in this case because such review is barred by the doctrine of sovereign immunity. We disagree.

■ We first note that limited judicial review of federal action has long been available at common law:

[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief.

*Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); *see also Youngstown*

---

**5.** In holding here that the President must have at his disposal information collected in accordance with statutory procedures, we do not hold that the district court may review the entirely distinct question of whether and to what extent the President uses the information. As we previously held, the Act commits that decision to the President's discretion. *Specter*, 971 F.2d at 946.

*Sheet,* 343 U.S. at 585–87, 72 S.Ct. at 866–67. Although this principle is limited, *see, e.g., Larson,* 337 U.S. at 690, 69 S.Ct. at 1461 ("A claim of error in the exercise of [delegated] power is ... not sufficient."),[6] as counsel for the defendants conceded at oral argument, and as both *Youngstown Sheet* and *Franklin* make clear, judicial review of the constitutionality of executive action is not barred by the doctrine of sovereign immunity. Thus, where, as here, plaintiffs allege that presidential action has failed to comply with the mandatory procedural requirements of the only statute authorizing such action and has thereby violated the constitutionally-mandated separation of powers, sovereign immunity concerns do not apply.

■ Even if the inapplicability of sovereign immunity in this context were not clear from the doctrine enunciated in *Larson* and *Youngstown Sheet,* however, we believe this case would still be controlled by the express waiver found in the APA:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (1988).

Here, plaintiffs do not seek monetary damages; they seek injunctive relief.[7] Plaintiffs also state a claim that the Secretary of the Navy, the Secretary of Defense, and the Base Closure Commission have acted under color of legal authority in violation of the Act and that the Secretary of Defense, similarly acting under color of legal authority, is threatening to close the Shipyard as the final step of an illegal process. This is thus a situation that § 702 literally reads on. It is also a situation that precisely fits the congressional intent behind this waiver of sovereign immunity. *See, e.g.,* H.R.Rep. No. 1656, 94th Cong., 2d Sess. 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6121, 6121 ("The proposed legislation would amend section 702 of title 5, U.S.C., so as to remove the defense of sovereign immunity as a bar to judicial review of Federal administrative action...."); *id.* at 9, 1976 U.S.C.C.A.N. at 6129 ("[T]he time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity."); 4 Kenneth C. Davis, *Administrative Law Treatise* § 23:19, at 192 (2d ed. 1984) ("The meaning of the 1976 legislation is entirely clear on its face, and that meaning is fully corroborated by the legislative history. That meaning is very simple: Sovereign immunity in suits for relief other than money damages is no longer a defense.").[8] Our cases are also clear that the waiver of sovereign immunity contained in § 702 is not limited to suits brought under the APA. *See Johnsrud v. Carter,* 620 F.2d 29, 31 (3d Cir.1980); *Jaffee v. United States,* 592 F.2d 712 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *see also* 4 Davis, *supra,* § 23:19, at 195 ("The abolition of sovereign immunity in § 702 is not limited to suits 'under the Administrative Procedure Act'; the abolition applies to every 'action in a court of the United States

---

**6.** *Larson* was essentially a breach of contract action against an agent of the federal government. The Court rejected plaintiff's contention that the agent's breach was *ultra vires* and thereby stripped of sovereign immunity protection; instead, it held that because the agent was authorized to "administer a general sales program encompassing the negotiation of contracts, the shipment of goods and the receipt of payment," his actions were within delegated authority and were therefore protected by sovereign immunity: "[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private

principal under the normal rules of agency." *Larson,* 337 U.S. at 695, 69 S.Ct. at 1464.

**7.** Effective relief can be granted by an order prohibiting the Secretary of Defense from closing the Shipyard.

**8.** The legislative history of the immunity waiver also indicates congressional recognition of the *ultra vires* doctrine and the difficulties and complexities involved in its application; it evinces an intent to eliminate the need for "wispy fictions" in favor of a clear waiver. *See* H.R.Rep. No. 1656, *supra,* at 5–7, 1976 U.S.C.C.A.N. at 6125–28.

seeking relief other than money damages . . .' No words of § 702 and no words of the legislative history provide any restriction to suits 'under' the APA.").

■ The only argument we can conceive against the applicability of § 702 here is that the President was involved at one stage of the process that led to the allegedly illegal action that will injure plaintiffs. While, as we earlier concluded, the nature of the role assigned to the President by the Act makes his decisionmaking unreviewable, the fact that he played a role provides no justification for holding the process and the final executive action immune from review for compliance with the mandatory procedural requirements of the Act. While suits, like *Franklin*, seeking to secure presidential action or forbearance pose special problems, those problems are not presented in the situation before us.[9] As Justice Scalia explained in his opinion in *Franklin*, the fact that the federal courts "cannot direct the President to take a specified executive act" does not

in any way suggest that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive, see, *e.g.*, *Youngstown Sheet & Tube Co v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Panama Refinancing Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935)—just as unlawful legislative action can be reviewed, not by suing Members of Congress for the performance of their legislative duties, see, *e.g.*, *Powell v. McCormack*, 395 U.S. 486, 503–506, 89 S.Ct. 1944, 1954–1956; 23 L.Ed.2d 491 (1969); *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *Kilbourn v. Thomp-*

*son*, 103 U.S. 168, 26 L.Ed. 377 (1881), but by enjoining those congressional (or executive) agents who carry out Congress's directive.

*Franklin*, —— U.S. at ——, 112 S.Ct. at 2790 (Scalia, J., concurring).

## V.

Accordingly, we conclude that nothing in *Franklin* suggests that our prior approach to this case was incorrect. We reaffirm our prior opinion and we will remand to the district court for further proceedings consistent therewith. In light of the objectives of the Act discussed in our prior opinion, the district court should conduct those proceedings as expeditiously as possible.

ALITO, Circuit Judge, dissenting.

The majority rests its decision on arguments that are not properly before us, since the plaintiff-appellants did not raise them either before or after remand from the Supreme Court. Moreover, I believe that the majority's arguments are wrong on the merits and may have unfortunate future implications. I therefore respectfully dissent.

## I.

When this case was initially before us, the majority held that the closing of the Philadelphia Naval Shipyard was subject to judicial review to determine whether certain procedural requirements of the Defense Base Closure and Realignment Act of 1990 had been satisfied. *Specter v. Garrett*, 971 F.2d 936 (3d Cir.1992). The Supreme Court subsequently decided *Franklin v. Massachusetts*, —— U.S. ——, 112 S.Ct. 2767 (1992), which concerned, among other things, whether the Administrative Procedure Act authorized re-

---

9. Indeed, given *Franklin's* holding that the President is not an "agency" within the meaning of the APA, the waiver of sovereign immunity contained in § 702 may not apply to suits against the President. Nevertheless, this only potentially creates a barrier to suit where the President is named as a defendant and/or relief can only be effective if directed at the President—a situation not present here. While we do not regard *Franklin* as turning on sovereign immunity doctrine, we note that § 702 might not waive sovereign immunity in the situation there before the Court.

As the *Franklin* Court recognized, "it is the President's personal transmittal of the report to Congress that settles the reapportionment." *Franklin*, —— U.S. at ——, 112 S.Ct. at 2775. In *Franklin*, it appears that the only effective relief was relief that would require the President's forbearance. *See Franklin*, —— U.S. at ——, 112 S.Ct. at 2790 (Scalia, J., concurring) ("[W]e cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush.").

view of actions taken under a statutory scheme similar to that in the Defense Base Closure and Realignment Act. The Court held that the Secretary of Commerce's report to the President concerning the total population by states as revealed by the decennial census is not "final agency action" reviewable under the APA, 5 U.S.C. § 704, and that actions taken by the President are not subject to APA review. After handing down its decision in *Franklin*, the Supreme Court vacated this court's prior decision in this case and remanded for reconsideration in light of *Franklin*. *O'Keefe v. Specter*, —— U.S. ——, 113 S.Ct. 455, 121 L.Ed.2d 364 (1992).[1]

On remand, the plaintiffs vigorously contended that the statutory scheme in *Franklin* is materially different from the scheme involved here and that *Franklin* therefore does not bar review *under the APA*. The plaintiffs did not argue, as the court now holds, that they were entitled to non-APA review based on either common law or separation of powers principles. Nor had the plaintiffs advanced either of those theories when this case was initially before us or, as far as I can determine, when the case was in the district court. The majority, however, chooses to sidestep the APA argument that the plaintiffs have pressed. Instead, the majority grounds its decision on the common law and separation of powers arguments that it has devised and injected into this case.

I cannot endorse this approach. I would address the argument that the plaintiffs have raised and that the parties have briefed—i.e., whether, despite *Franklin*, the closing of the

Shipyard is reviewable under the APA. The First Circuit recently considered *Franklin's* effect on judicial review under the Defense Base Closure and Realignment Act. *Cohen v. Rice*, 992 F.2d 376 (1st Cir.1993). The plaintiffs in that case alleged that the process had been tainted by "faulty procedures, e.g., failing to hold public hearings and failing to provide information to Congress and the GAO." *Id.* at 382. The First Circuit held that under *Franklin* APA review for these claims was unavailable. Because I agree that the statutory scheme at issue here is not materially distinguishable from the scheme in *Franklin*, I would hold that APA review is unavailable. And I would go no further.

II.

Since the majority has gone further, however, and since the majority's analysis may affect future cases, I will explain briefly why I believe the majority's analysis is flawed. The majority opinion, as I understand it, reasons as follows. First, "[t]he President must have constitutional or statutory authority for whatever action he wishes to take." Majority at 409. Second, judicial review is available outside the APA to determine whether presidential action violates or exceeds that authority. *Id.* at 409–11. Third, under the Base Closure and Realignment Act, the President lacks statutory authority to approve or implement the closing of a base if the Base Closure Commission's recommendation regarding that base was tainted by violations of the Act's procedural requirements.[2] Therefore, since the plaintiffs in this

1. Neither of the arguments suggested by *Franklin*—i.e., that the recommendations of the Base Closure Commission do not constitute "final agency action" under the APA and that presidential action is not reviewable under the APA—was raised by the defendants when this appeal was first before us. The defendants contend that we must nevertheless reach these issues because they are jurisdictional. Whether or not an appellate court would always be compelled to consider issues of this nature even if they are not raised by the parties, I believe it is appropriate for us to reach them here. If we refused to reach these issues now, the case would be remanded, and the defendants could then raise them before the district court. Under these circumstances, our refusal to entertain these issues at the present time

might further delay the expeditious disposition of this case.

2. The majority puts it as follows (majority at 407), quoting *Specter v. Garrett*, 971 F.2d 936, 947 (3d Cir.1992):

Congress intended that domestic bases be closed *only* pursuant to an exercise of presidential discretion *informed by recommendations of the nation's military establishment and an independent commission based on a common and disclosed (1) appraisal of military need, (2) set of criteria for closing, and (3) data base.*

The majority later adds that the President's authority under the Base Closure and Realignment Act to approve or order the closing of a base

case allege that such procedural violations occurred with respect to the Philadelphia Naval Shipyard, the President's approval of the closing of the Shipyard and/or the Secretary of Defense's implementation of the closing are subject to non-APA judicial review.

Putting aside whatever else may be said about this analysis, it seems plain to me that its third step is incorrect, for the Base Closure and Realignment Act does not limit the President's authority in the way the majority suggests. The Act does not require the President to reject the Commission's package of recommendations if the recommendations regarding one or more bases are tainted by procedural violations. Nor does the Act require or authorize the President or his subordinates to refrain from carrying through with the closing or realignment of such bases following presidential approval of the Commission's package and the expiration of the period for congressional disapproval.

The President's powers and responsibilities under the Base Closure and Realignment Act are clearly set out in Section 2903(e). In brief, the President, after receiving the Commission's package of recommendations by July 1 of the year in question, must decide whether to accept the entire package or return it to the Commission. If, as was the case in 1991, the President decides to accept the package, he must transmit a report containing his approval to the Commission as well as to Congress. He must also transmit a copy of the Commission's recommendations and a certification of his approval to Congress. Section 2903(e)(1), (2). Congress then has 45 days to disapprove the package (Section 2904(b)), and if, as was the case in 1991, Congress does not disapprove, the Secretary of Defense "shall" close and realign bases in accordance with the package. Section 2904(a).

Nothing in these provisions suggests that the President, upon receiving the Commission's recommendations, must determine whether any procedural violations occurred at any prior stage of the statutory process. Nothing in these provisions suggests that the President must reject the Commission's package of recommendations if such procedural violations come to his attention. Nothing in these provisions suggests that the President must base his approval or disapproval of the Commission's recommendations exclusively on the record of the proceedings before the Commission. Nothing in these provisions suggests that the President, if he wishes to approve the Commission's recommendations, must do so for the same reasons as the Commission. And nothing in these provisions suggests that the President or the Secretary of Defense must or even can refuse to carry out a base closing or realignment contained in an approved package of recommendations on the ground that the Commission's recommendation regarding the affected base was tainted by prior procedural irregularities.

Under the plain language of the Base Closure and Realignment Act, the President's sole responsibility, upon receiving a package of recommendations from the Commission, is to decide within a very short period whether, based on whatever facts and criteria he deems appropriate, the entire package of recommendations should be accepted or whether the recommendations should be returned to the Commission. After the President has approved a package of recommendations and the time for congressional disapproval has expired, the sole responsibility of the Secretary of Defense is to carry out the indicated closings and realignments. In the case before us, this is precisely what the President did and what the Secretary of Defense wishes to do, and therefore I see no possible ground for arguing that the Executive violated any statutory command or exceeded its statutory authority at these stages of the base closure and realignment process.[3]

---

"has been expressly confined by Congress to action based on a particular type of process." Majority at 409. In addition, the majority states that the President's subordinates are "threatening to close the Shipyard as the final step of an illegal process." Majority at 410.

**3.** As I noted in my prior dissent (971 F.2d at 956 n. 2), the plaintiffs are not challenging the propriety of anything that occurred after the transmission of the Commission's recommendations to the President. Rather, their claims relate to actions taken at earlier stages. But as the majority itself has recognized, actions taken prior to

The Base Closure and Realignment Act calls for three cycles of recommended closures and realignments—in 1991, 1993, and 1995. In this case, we are still considering a closure that was recommended and approved in the first cycle. In the meantime, the second cycle is already well underway. When Congress enacted the Base Closure and Realignment Act, it knew that unnecessary military installations can waste enormous sums of money and that litigation can effectively delay closings and realignments for years. In my view, Congress clearly wanted to put an end to these delays, but our court, by allowing judicial review of base closings and realignments, is frustrating the implementation of Congress's intent.

## SUR PETITION FOR REHEARING

June 14, 1993.

BEFORE: SLOVITER, Chief Judge, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, and LEWIS, Circuit Judges.

The petition for rehearing filed by appellees in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judge Hutchinson, Judge Nygaard, and Judge Alito would have granted rehearing in banc.

the end of the process required by the Act had no adverse impact on the plaintiffs and thus are not subject to judicial review under any theory. Majority at 407 & n. 2.